## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Anuj Thapa,                                    Case No. 19-cv-2568 (TNL)

      Plaintiff,

v.                                             **ORDER**

St. Cloud Orthopedic Associates, Ltd.,

      Defendant.

---

Brandon E. Thompson and Rachel Louise Barrett, Ciresi Conlin LLP, 225 South Sixth Street, Suite 4600, Minneapolis, MN 55402 (for Plaintiff); and

Troy Booher, Zimmerman Booher, Felt Building, Suite 400, 341 South Main Street, Salt Lake City, UT 84111; Steven R. Schwegman, Michelle Draewell, and Chad A. Staul, Quinlivan & Hughes, PA, P.O. Box 1008, St. Cloud, MN 56302; John M. Bjorkman, Pat O'Neill, III, , Larson King, LLP, 30 East Seventh Street, Suite 2800, St. Paul, MN 55101; and James F. Dunn, The Law Office of James F. Dunn, P.A., 860 Blue Gentian Road, Suite 180, Eagan, MN 55121 (for Defendant).

---

## I. INTRODUCTION

In January 2017, Plaintiff Anuj Thapa was a 19-year-old, first-year college student at St. Cloud State University in St. Cloud, Minnesota.  On January 14, 2017, Plaintiff fractured his left tibia and fibula while playing soccer.  Plaintiff was taken to St. Cloud Hospital and underwent surgery to treat those injuries.  Dr. Chad Holien, an orthopedic surgeon, performed the surgery, and William Paschke, a certified physician's assistant, assisted in treating Plaintiff.  Plaintiff was discharged from the hospital the following night.

Plaintiff returned to St. Cloud Hospital six days later complaining of pain.  Dr. Matthew Hwang, an orthopedic surgeon, took Plaintiff into surgery.  Dr. Hwang discovered

that Plaintiff had experienced acute compartment syndrome.   Acute compartment syndrome is a condition that, if untreated, can cause severe tissue damage and tissue death, resulting in the loss of body function.   Plaintiff has since undergone a dozen surgeries and spent 54 days in the hospital.   Plaintiff now walks with a limp and continues to experience pain in his left leg.

In September 2019, Plaintiff brought this lawsuit against Defendant St. Cloud Orthopedic Associates, Ltd., asserting claims of medical malpractice.   The claims were tried before a jury in May 2022.   The jury found that Defendant was negligent in its care and treatment of Plaintiff.   The jury awarded Plaintiff $10 million in past pain, disability, disfigurement, embarrassment, and emotional distress, and $493,073.22 in past medical expenses.   The jury also awarded Plaintiff $100 million in future pain, disability, disfigurement, embarrassment, and emotional distress, and $758,486 in future medical expenses, for a total award of $111,251,559.22.

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion for New Trial, or Alternatively, Remittitur, ECF No. 183.   A hearing on the motion was held on February 25, 2023.   ECF No. 223. The most recent stay of this case, ECF No. 231, was effectively lifted on October 1, 2023, based on the parties' joint request. ECF No. 232. Attorneys Brandon E. Thompson and Rachel Louise Barrett appeared on behalf of Plaintiff.   Attorneys Troy Booher, Steven R. Schwegman, James F. Dunn, Pat O'Neill, III, and Michelle Draewell appeared on behalf of Defendant.

For the reasons that follow, Defendant's Motion for New Trial, or Alternatively, Remittitur is denied, except that the Court will conditionally grant a new trial on the amount

of non-economic damages and offer Plaintiff the option of remitting the award from $110 million to $10 million.

## II. ANALYSIS

Defendant moves for a new trial, alleging evidentiary errors and attorney misconduct at trial entitle it to a new trial on liability and damages. ECF No. 183; Def.'s Mem. in Supp., ECF No. 184 at 10. Defendant also contends it is entitled to a new trial on liability and damages because the jury's verdict is "shockingly excessive and tainted by passion and prejudice." Def.'s Mem. in Supp. at 15. In the alternative, Defendant argues that it is entitled to a new trial on damages or, at a minimum, a substantial remittitur. *Id.* at 31.

### A. Alleged Evidentiary Errors

Defendant moves for a new trial under Federal Rule of Civil Procedure 59(a). Under Rule 59(a), the Court may "grant a new trial on all or some of the issues—and to any part . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). As the Eighth Circuit has explained:

> [A] trial court may not grant a new trial simply because the trial court would have found a verdict different from the one the jury found. This is certainly a necessary condition to granting a motion for new trial, but it is not a sufficient one. Rather, the trial court must believe . . . that the verdict was so contrary to the evidence as to amount to a miscarriage of justice.

*Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996). In other words, the Court should grant a new trial when "the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence, or acted under some mistake." *In re*

*Levaquin Prods. Liab. Litig.*, 700 F.3d 1161, 1166 (8th Cir. 2012) (internal citations and quotations omitted). Evidentiary errors warrant a new trial only when "the cumulative effect of the errors is to substantially influence the jury's verdict." *Williams v. Cty. of Kansas*, 223 F.3d 749, 755 (8th Cir. 2000). District courts enjoy broad discretion in deciding whether to grant a new trial. *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 656 (8th Cir. 1995).

Defendant cites five evidentiary errors which "allowed the unfair presentation of evidence and contributed to the excessive verdict." Def.'s Mem. in Supp. at 2. The Court addresses each of Defendant's arguments below.

### 1. Dr. Quinn's Testimony

First, Defendant argues that the Court erred by admitting expert testimony from Dr. Robert Quinn. *Id*. At trial, Plaintiff's counsel elicited the following testimony from Dr. Quinn, which, according to Defendant, implied that Defendant was responsible or liable for the oversight and direction of St. Cloud Hospital nurses:

> Well, I think the way the system operates, once we write the discharge order, we made a determination that the patient is fine to go home and then once that train starts going, it's pretty hard to reel it back in. Everybody is then focused. . . . I'm just talking in general in any hospital system, **it's not fault of the system, it's just that . . . when the order is given to be discharged, then the system therefore assumes that the doctor has cleared the patient to do so and then every effort is made to discharge the patient as ordered.**

*Id*. at 2-3. According to Defendant, this testimony "confused the jury with respect to [Defendant's] role in evaluating and assessing whether [Plaintiff] met the parameters for discharge." *Id*. at 3.

4

Defendant, however, did not make this argument at trial. If evidence is introduced at trial without objection, the Court reviews for plain error. *Spencer v. Young*, 495 F.3d 945, 949 (8th Cir. 2007). "Plain error review is narrow and confined to the exceptional case where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings. The verdict should be reversed only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected." *Chem-Trend, Inc. v. Newport Indus., Inc.*, 279 F.3d 625, 629 (8th Cir. 2002). Here, the Court is not persuaded that Dr. Quinn "implied [Defendant] was responsible or liable for the oversight and direction of St. Cloud Hospital nursing staff," *see* Def.'s Mem. in Supp. at 2, or that such testimony seriously affected the fairness of the trial.

### 2.  Dr. Anderson's Testimony

Defendant next contends that the Court erred by admitting certain expert testimony from Plaintiff's treating provider, Dr. Sarah Anderson. *Id*. at 3. Under Federal Rule of Civil Procedure 26(a)(2)(C), Plaintiff disclosed that Dr. Anderson would testify at trial "consistent with her medical records and physical examinations" of Plaintiff, her "recommendations for care in the future," and "her opinions on the way [Plaintiff]'s compartment syndrome likely developed." *Id*. at 3-4. According to Defendant, at trial, Dr. Anderson testified outside the scope of her treatment of Plaintiff, including about "certain patients" who could be at a higher risk for compartment syndrome generally; overarching compartment syndrome risk factors; opinions regarding the types of training doctors receive to monitor patients at risk for compartment syndrome; and the practice of "sequential exams." *Id*. at 4. Because Dr. Anderson was not disclosed as a standard of

care expert and did not submit a written report under Rule 26(a)(2)(B), Defendant argues that any opinion outside the scope of Dr. Anderson's treatment of Plaintiff was inadmissible. *Id.* at 3-4.

Before trial, making the same argument it makes here, Defendant sought a ruling from the Court to limit Dr. Anderson's testimony. *See* ECF Nos. 141, 142. The Court denied Defendant's request. A review of the record confirms that the Court's ruling was appropriate.

Plaintiff disclosed properly that Dr. Anderson would serve as an expert under Rule 26(a)(2)(C). The Federal Rules of Civil Procedure require that parties make certain disclosures regarding their experts. *See* Fed. R. Civ. P. 26(a)(2). These expert disclosures are broken into two categories relevant to the present matter: experts who must provide a written report containing certain information, *see* Fed. R. Civ. P. 26(a)(2)(B), and experts who are subject to less demanding disclosure requirements and need not produce these written reports, *see* Fed. R. Civ. P. 26(a)(2)(C). Experts who must disclose written reports are those "retained or specially employed to provide expert testimony in the case . . . ." Fed. R. Civ. P. 26(a)(2)(B). Experts not so retained are subject to the less demanding disclosure requirements of Rule 26(a)(2)(C). The Advisory Committee Notes to the 1993 Amendments to Rule 26(a)(2) state, "A treating physician . . . can be deposed or called to testify at trial without any requirement for a written report." *See also Waste Connections, Inc. v. Appleton Elec., LLC*, No. 8:12CV436, 2014 WL 1794883, at *5-6 (D. Neb. May 6, 2014) (treating physicians not retained solely for the purpose of testifying at trial were not required to disclose written reports under Rule 26(a)(2)(B)); *Crabbs v. Wal-Mart Stores,*

*Inc.*, No. 4:09-CV-00519-RAW, 2011 WL 499141, at *1 (S.D. Ia. Feb. 4, 2011) (non-retained treating physicians are subject to the disclosure requirements of Rule 26(a)(2)(C), not Rule 26(a)(2)(B)).  Here, there is no dispute that Dr. Anderson treated Plaintiff in June 2020.  *See* ECF Nos. 141, 142.  Nor is there any indication that Dr. Anderson is an expert "retained or specially employed to provide expert testimony" in this case.  *See* Fed. R. Civ. P. 26(a)(2)(B).

Plaintiff also disclosed properly "the subject matter on which [Dr. Anderson was] expected to present" expert opinion testimony and "a summary of the facts and opinions to which [she was] expected to testify."  *See* Fed. R. Civ. P. 26(a)(2)(C).  Plaintiff's disclosure stated, among other things, that Dr. Anderson "will discuss her recommendations for care in the future, including the need for periodic orthopedic follow-up examinations, participation in physical therapy to strengthen and maximize uninjured muscles, consultation with a pain clinic to address medications, modalities and therapies for pain and nerve pain, and the use of AFOs," and, in providing these opinions, "Dr. Anderson will discuss compartment syndrome" and "provide her opinions on the way [Plaintiff's] compartment syndrome likely developed."  ECF No. 141 at 6.  The Court concludes that Plaintiff's disclosure of Dr. Anderson's testimony was sufficiently detailed to put Defendant on notice of Dr. Anderson's testimony and complied with the requirements of Rule 26(a)(2)(C).  Accordingly, the Court finds no error in admitting the testimony.

Further, even if certain testimony of Dr. Anderson was inadmissible, the admission of this evidence was not "so prejudicial that a new trial would likely produce a different result."  *See Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 351 (8th Cir. 2002)

(citation omitted). Dr. Anderson's testimony was relatively brief and was consistent with other testimony presented at trial regarding compartment syndrome. The admission of such testimony therefore did not result in fundamental unfairness.

### 3. Spinal Stroke Evidence

Defendant also argues that the Court erred by excluding evidence of Plaintiff's spinal stroke. Def.'s Mem. in Supp. at 4. According to Defendant, excluding evidence of Plaintiff's spinal stroke left the jury "unaware that [Plaintiff] had an intervening medical event that accounted for some of his present complaints related to pain, weakness, and other full body injuries." *Id*. at 5.

Shortly before trial, Defendant moved the Court for an order allowing it to admit evidence of Plaintiff's spinal stroke. *See* ECF Nos. 143, 144. Defendant argued that such evidence was "directly relevant and related to Plaintiff's damages and presents evidence of [P]laintiff's overall physical condition." ECF No. 144 at 3. Plaintiff objected to the introduction of such evidence, contending that a spinal stroke is a "very complicated medical condition[] that cannot possibly be understood by a layperson without the assistance of expert medical testimony," which Defendant did not obtain. ECF No. 143 at 2. The Court excluded the evidence, holding that Defendant had ample opportunity to present expert testimony about whether the spinal stroke is related to Plaintiff's compartment syndrome, the negligence of Defendant, or the damages at issue in the case, but failed to do so. Tr. Vol. II at 32:19-23, ECF No. 169. The Court concluded that evidence of Plaintiff's spinal stroke should be excluded under Federal Rule of Evidence 403, noting that "[t]he Court has serious concerns that absent expert testimony on the

8

issue[,] the jury would be confused and be left to speculate about the relationship between the spinal stroke and [P]laintiff's injuries." *Id*. at 33:2-10. The Court concluded that the danger of unfair prejudice and confusing of the issues substantially outweighed the probative value of any evidence of Plaintiff's spinal stroke. *Id*. at 33:13-16.

The Court stands by its ruling. *See Rodrick v. Wal-Mart Stores E., L.P.*, 666 F.3d 1093, 1096 (8th Cir. 2012) ("[T]he district court [is afforded] broad discretion in its evidentiary rulings, in deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters.") (internal quotations and citation omitted). Relevant evidence may be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Court again finds that the probative value of the evidence of Plaintiff's spinal stroke was substantially outweighed by unfair prejudice to Defendant, confusion of the issues, and misleading the jury.

### 4. Mechanical Engineer Testimony

Next, Defendant contends that the Court erred by "permit[ting] Plaintiff's counsel to introduce cumulative and prejudicial evidence regarding [Plaintiff's] ability and intention to make a living as a mechanical engineer." Def.'s Mem. in Supp. at 5. According to Defendant, "Plaintiff's counsel conducted lengthy examinations" of multiple witnesses, including Plaintiff, regarding his "'dream' or 'goal of becoming a mechanical engineer' and the contention that he was no longer able to continue his studies due to his injuries." *Id*. at 5-6. Defendant argues that these questions and answers "served no purpose

other than to inflame the passions of the jury." *Id*. at 6.

Again, Defendant did not make this argument at trial. The Court finds no error—let alone plain error—with respect to the testimony that Plaintiff could no longer achieve his "dream" of becoming a mechanical engineer. *See Spencer*, 495 F.3d at 949 (reviewing evidence introduced at trial without objection for plain error). Nor does the Court find that such testimony seriously affected the fairness of the trial.

### 5. Dr. Szalapski's Testimony

Defendant also argues that the Court erred by allowing Plaintiff's counsel to question its medical expert, Dr. Edward Szalapski, regarding his income in order to demonstrate an alleged financial bias. Def.'s Mem. in Supp. at 6. According to Defendant, "the Court allowed Plaintiff's [counsel] to question Dr. Szalapski at length regarding his overall income and his income derived from serving as a defense witness," which "placed an improper and prejudicial emphasis on Dr. Szalapski's finances." *Id*. at 7-8.

Before Dr. Szalapski testified, Defendant moved the Court for an order limiting Plaintiff's questioning into Dr. Szalapski's finances. ECF No. 148. Defendant argued that "Plaintiff should be precluded from inquiring into Dr. Szalapski's finances beyond the amounts he has billed and charges for this specific case and the information provided by Dr. Szalapski in his declaration," which was provided to Plaintiff. *Id*. at 1. The Court granted Defendant's motion in part and denied the motion in the part. The Court concluded that Plaintiff could not ask Dr. Szalapski about his specific yearly income because such testimony would create a potential bias and be cumulative of other testimony. The Court held that Plaintiff could ask Dr. Szalapski what income he made from testifying in this

particular case and what percentages of his income are attributable to his work as an expert witness.  Tr. Vol. V at 714:8-717:21, ECF No. 171.

According to Defendant, despite the Court's ruling, "the Court allowed Plaintiff's [counsel] to question Dr. Szalapski at length regarding his overall income and his income derived from serving as a defense witness."  Def.'s Mem. in Supp. at 7.  A review of the record, however, shows that this is not accurate.  *See* Tr. Vol. V at 779:12-817:13, 791:22-792:1.  Plaintiff's counsel's only question to Dr. Szalapski about his income was whether it was true that "a third of [his] income" comes from doing work on legal cases.  Tr. Vol. V at 791:22-792:1.  As Plaintiff notes, his cross-examination of Dr. Szalapski focused on Dr. Szalapski's longstanding relationship with defense attorneys and his work performing independent medical examinations.  *See* Pl.'s Mem. in Opp., ECF No. 199 at 41.  Plaintiff's counsel's questions stayed squarely within the Court's ruling, and there was nothing inappropriate about Plaintiff's counsel's examination of Dr. Szalapski.

In addition, Defendant must do more than merely claim that the Court erred in its rulings.  Defendant must demonstrate that such errors were "so prejudicial that a new trial would likely produce a different result."  *See Bevan v. Honeywell, Inc.*, 118 F.3d 603, 612 (8th Cir. 1997).  Not only has Defendant failed to show that the Court's rulings were erroneous, but it has failed to show that any alleged errors were so prejudicial as to alter the outcome of the case.

In sum, none of Defendant's five alleged evidentiary errors supports granting a new trial.  The Court finds that its evidentiary rulings were proper.  And, even assuming the Court agreed with any of Defendant's evidentiary error arguments, viewing the trial record

as a whole, the Court finds that the "cumulative effect" of any evidentiary errors did not "substantially influence the jury's verdict." *See Williams*, 223 F.3d at 755.  Nor was the verdict "so contrary to the evidence as to amount to a miscarriage of justice," thereby requiring a new trial.  *See Butler*, 83 F.3d at 944.  Thus, any errors were not "so prejudicial that a new trial would likely produce a different result."  *See Harrison*, 312 F.3d at 351 (citation omitted).

## B. Alleged Attorney Misconduct

Defendant contends that Plaintiff's counsel demonstrated a "pattern of misconduct designed to inflame the passion and prejudice of the jury" during his closing argument. Def.'s Mem. in Supp. at 7.  Defendant points to three specific arguments in Plaintiff's counsel's closing argument that constitute attorney misconduct.  First, Defendant takes issue with Plaintiff's counsel characterizing Dr. Szalapski's income from serving as an expert witness as "umpteen gazillions of dollars."  *Id*.  Defendant argues that Plaintiff's counsel's repeated references to Dr. Szalapski's income "placed an improper and prejudicial emphasis on Dr. Szalapski's finances," and implied "that Dr. Szalapski and defense counsel conspired to offer a biased evaluation of the evidence for 'umpteen gazillions.'"  *Id*. at 8; Def.'s Reply at 14, ECF No. 201 (quoting Tr. Vol. VI at 921:15-25, 922:1-7, ECF No. 172).  Second, Defendant argues that Plaintiff's counsel "introduced wholly new facts" in his closing argument.  Def.'s Mem. in Supp. at 8.  Defendant argues that Plaintiff's counsel recounted private conversations Defendant had with unnamed individuals, and further relayed private conversations between counsel and Plaintiff to supplement Plaintiff's earlier testimony.  *Id*. at 8-9.  According to Defendant, Plaintiff's

counsel's remarks "lack any evidentiary basis and are wholly irrelevant statements, designed to appeal to the jury's passions and prejudice over any facts in dispute." *Id*. Third, Defendant argues that Plaintiff's counsel influenced the jury to base its damages award on conjecture and speculation rather than evidence. *Id*. at 9-10. Specifically, Defendant challenges Plaintiff's counsel's remark that it is the jury's decision whether "the greatest harm in the case is worth the same as the medical expenses or twice as much, or three times as much, or 50 times as much." *Id*. (quoting Tr. Vol. VI at 949:4-16).

"When a new trial motion is based on improper closing arguments, a new trial should be granted only if the statements are plainly unwarranted and clearly injurious and cause prejudice to the opposing party and unfairly influence a jury's verdict." *Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 556 (8th Cir. 2017) (internal quotations and citations omitted); *accord Lawrey v. Good Samaritan Hosp.*, 751 F.3d 947, 954 (8th Cir. 2014); *Harrison*, 312 F.3d at 351. In determining whether to grant a motion for a new trial based on improper closing arguments, courts consider the following four factors: (1) whether the remarks in question were "minor aberrations made in passing"; (2) whether the district court took specific curative action; (3) whether the size of the damage award suggests that counsel's remarks had a prejudicial effect; and (4) whether the weight of the evidence suggests that the improper remarks deprived a party of a fair trial. *Ventura v. Kyle*, 825 F.3d 876, 885 (8th Cir. 2016) (internal quotations and citations omitted). As the Eighth Circuit has stated, "[i]t will be a rare case when [a] court finds that a party has made a sufficient showing of prejudice caused by plainly unwarranted and clearly injurious closing argument." *Smiley*, 859 F.3d at 556 (internal quotations and citations omitted);

*accord Gilster v. Primebank*, 747 F.3d 1007, 1008 (8th Cir. 2014).

This is not a "rare case" in which allegedly improper remarks made by Plaintiff's counsel require a new trial. *See Smiley*, 859 F.3d at 556. Rather, after reviewing the remarks closely in context, the Court finds that they were not improper, plainly unwarranted, or clearly injurious. *See id.* Considering the relevant factors, none of the challenged remarks can be considered anything more than minor aberrations made in passing. *See Ventura*, 825 F.3d at 885.

Plaintiff's counsel made only a brief and vague reference to the fact that Plaintiff wanted him to thank the jurors for their close attention during the trial. *See* Tr. Vol. VI at 912:10-20 ("He told me he wanted me to thank you. To tell you that he's been . . . watching you throughout the trial, and he's astonished at how close attention the eight of you have paid to listening to his story, and so he wanted me to thank you."). There is nothing plainly unwarranted or clearly injurious about this remark. As the Court noted at trial, the jurors were instructed clearly and were very attentive, and the Court has no concerns that Plaintiff's counsel's comment that his client wanted to thank the jury for their attentiveness would be confusing or prejudicial to Defendant. *See* Tr. Vol. VI at 954:15-23.

Plaintiff's counsel also made only a brief reference to Dr. Szalapski's income, stating that Dr. Szalapski spends only 10 percent of his time doing expert work but makes 30 percent of his income doing it, and all the work is for defense attorneys. Plaintiff's counsel then stated that if he could spend 10 percent of his time making 30 percent of "however many umpteen gazillions of dollars" Dr. Szalapski makes, he "would probably be pretty interested in telling the defense lawyers what they want to hear as well." Defense

14

counsel then objected to this statement as improper.  The Court sustained portions of the objection, namely, the statement that Dr. Szalapski makes "umpteen gazillions of dollars." Plaintiff's counsel then restated his remarks, removing the statement about Dr. Szalapski making "umpteen gazillions of dollars."  Plaintiff's counsel stated only, "The testimony that you heard is that Dr. Szalapski makes 30 percent, a third of his income, testifying in court for [defense lawyers] and examining patients who have been hurt, for defense lawyers just like [defense counsel]. You can decide what you want to do with that."  *See* Tr. Vol. VI at 921:24-922:16.  Plaintiff's counsel stayed squarely within the Court's ruling.  The Court disagrees with Defendant's argument that such remarks "placed an improper and prejudicial emphasis on Dr. Szalapski's finances," and implied "that Dr. Szalapski and defense counsel conspired to offer a biased evaluation of the evidence for 'umpteen gazillions.'"  *See* Def.'s Mem. in Supp. at 8; Def.'s Reply at 14.

With respect to Defendant's argument that Plaintiff's counsel "introduced wholly new facts" regarding Plaintiff's second visit to the emergency room, the Court concludes that such remarks were neither plainly unwarranted nor clearly injurious.  Defense counsel objected to Plaintiff's counsel's remarks about Plaintiff's second visit to the emergency room during closing arguments, contending that no evidence introduced at trial supported such remarks.  The Court overruled the objection, finding that Plaintiff's counsel's remarks were supported by the evidence and reasonable inferences from the evidence.  *See* Tr. Vol. VI at 934:7-935:16, 955:3-12.  Closing arguments can be supported not only by the evidence, but also any "reasonable inferences from that evidence."  *See Gilster*, 747 F.3d at 1011 ("The cardinal rule of closing argument is that counsel must confine comments to

evidence in the record and to reasonable inferences from that evidence.") (quotations and citations omitted).  After reviewing the record closely, the Court finds that the remarks made by Plaintiff's counsel about Plaintiff's second visit to the emergency room constitute reasonable inferences from the evidence presented at trial.  Plaintiff's counsel's closing argument did not stray from the evidence or the reasonable inferences that could be drawn from it.  Accordingly, the remarks by Plaintiff's counsel were not improper.

The Court also rejects Defendant's argument that Plaintiff's counsel influenced the jury to use a multiplier of the special damages or otherwise base its damages award on conjecture and speculation rather than evidence.  In his closing argument, Plaintiff's counsel urged the jury to compensate Plaintiff for "what he's been through" and "what he's going to continue to go through," such as not being able to go hiking in the mountains with his friends or having pain when he tries to stand and cook a meal.  Plaintiff's counsel told the jury they should decide whether that harm "is worth the same as the medical expenses or twice as much, or three times as much, or 50 times as much."  Tr. Vol. VI at 949:4-24. The Court disagrees that this unobjected-to statement resulted in a miscarriage of justice that warrants a new trial.  *See Great Lakes Gas Transmission Limited Partnership v. Essar Steel Minnesota, LLC*, No. 09-cv-3037 (SRN/LIB), 2016 WL 54193, at *10 (D. Minn. Jan. 5, 2016) (citing *Wichmann v. United Disposal, Inc.*, 553 F.2d 1004, 1106 (8th Cir. 1977) ("Counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial.")).  The Court's review of the record shows the comment was made in the context of asking the jury to determine the appropriate amount

16

of damages and was therefore not improper.

Further, even if any of Plaintiff's counsel's remarks constituted error, the Court finds that they were "not of such magnitude that a new trial is warranted." *See Smiley*, 859 F.3d at 556. The comments that Defendant takes issue with make up a very small portion of Plaintiff's lengthy closing argument, almost forty transcript pages in length. Further, the comments were not the primary theme of Plaintiff's counsel's closing argument. *See* Tr. Vol. VI at 9:12:2-951:16. Rather, the closing argument focused to a great extent on the evidence presented at trial and the testimony of the witnesses. Additionally, the Court instructed the jury that "[n]othing the attorneys say during the trial, including open statement and closing argument is evidence." *See* Tr. Vol VI at 849:19-21. Accordingly, the Court concludes that any alleged attorney misconduct in closing arguments does not warrant a new trial.

## C. Size of the Verdict

The Court next considers Defendant's argument that he is entitled to a new trial on liability and damages because the jury's $110 million non-economic damages award is (1) "tainted by passion and prejudice," and (2) "shockingly excessive." Def.'s Mem. in Supp. at 15. The Court also considers Defendant's alternative argument that the "excessive" verdict warrants a new trial on damages only or, at a minimum, a substantial remittitur.[1]

---

[1] Defendant does not challenge the jury's economic damages award. *See, e.g.*, ECF No. 184 at 1 ("The $110 million verdict for pain and suffering is so monstrous and shockingly excessive it is, on its face, a miscarriage of justice."); ECF No. 216 at 1 ("The court should remit the $110 million award or order a new trial."); ECF No. 218 at 1 ("[T]he $110 million noneconomic damages award is excessive."). The jury's economic damages award, including $493,073.22 in past medical expenses and $758,486 in future medical expenses, for a total of $1,251,559.22, is not excessive and will not be disturbed.

*Id.* at 31.  According to Defendant, the evidence presented at trial, along with comparable verdicts, do not support a non-economic damages award of anything over one million dollars.  *Id.*

### 1.  Passion and Prejudice

Defendant contends that the size of the verdict alone establishes that the jury's verdict was motivated by passion and prejudice.  Def.'s Reply at 5.  The Court disagrees. The Eighth Circuit has rejected this argument, holding that the amount of the verdict standing alone "raises only the weakest inference of jury misfeasance."  *See Wright v. Byron Financial, LLC*, 877 F.3d 369, 373 (8th Cir. 2017).  Further, while the jury returned "an extraordinarily large" damages award—which does "give[] the Court some pause" and, for reasons discussed below, is so excessive as to warrant remittitur—the Court finds that "the award is not so large as to indicate that the jury's findings regarding liability were the result of improper passion and prejudice."  *See Miller v. Board of Regents of University of Minnesota*, 402  F.Supp.3d  568,  581  (D. Minn. 2019).   As such, the Court denies Defendant's motion for a new trial on liability and damages on the grounds that the jury's verdict was motivated by passion and prejudice.

### 2.  Excessive Verdict

In determining whether the verdict is excessive, the Court is "guided by the law of the forum state."  *See Taylor v. Otter Tail Corp.*, 484 F.3d 1016, 1019 (8th Cir. 2007).  In Minnesota, the Court "may grant a new trial because of excessive damages that appear to have been given under the influence of passion or prejudice or are not justified by the evidence."  *Myers v. Hearth Technologies*, 621 N.W.2d 787, 792 (Minn. Ct. App. 2001);

*see also M.M. Silta, Inc. v Cleveland-Cliffs, Inc.*, 561 F.Supp.2d 1052, 1060 (D. Minn. 2008) ("[A] damages award is excessive if it exceeds the range of damages submitted in evidence."); *Willis v. Indiana Harbor Steamship Co.*, 790 N.W.2d 177, 188 (Minn. Ct. App. 2010) (stating that an award is excessive if "it could only be the result of passion or prejudice, or when the award is the result of speculation rather than the evidence presented at trial"). "In determining whether the verdict is excessive, the trial judge must consider all the evidence, the demeanor of the parties, and the circumstances of the trial." *Johnson v. Washington County*, 518 N.W.2d 594, 602 (Minn. 1994) (citations and quotations omitted).

"If a trial court determines that a jury award is excessive, it may order a new trial or condition a denial of a motion for a new trial on the plaintiff's acceptance of a remittitur." *Miller v. Huron Regional Medical Center*, 936 F.3d 841, 846 (8th Cir. 2019) (citations omitted). The Court should not grant remittitur just because it would have awarded a different amount than the jury. *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 553 (8th Cir. 2013); *see also Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016). Rather, the Court should order a remittitur "when it believes the jury's award is *unreasonable* on the facts." *Ross v. Kan. City Power & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002) (citation omitted) (emphasis in original). A remittitur is reserved for cases "where the verdict is so grossly excessive as to shock the judicial conscience." *Lincoln Composites*, 825 F.3d at 459 (quoting *Bennett*, 721 F.3d at 553); *see also Hudson v. United Sys. of Ark., Inc.*, 709 F.3d 700, 705 (8th Cir. 2013) (quoting *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 763 (8th Cir. 2003)) ("A verdict is

19

considered grossly excessive when 'there is plain injustice or a monstrous or shocking result.'").

The Court finds that the size of the verdict is "not so monstrous, shocking, or plainly unjust as to require a new trial." *See Wright*, 877 F.3d at 374. As discussed above, though the size of the verdict is extraordinarily large, the Court finds that there is no indication that it was given under the influence of improper passion and prejudice. Considering the evidence presented at trial, the demeanor of the parties, and the circumstances of the trial, the Court cannot conclude that a new trial is warranted. But, as explained below, the Court concludes that the size of the award is so excessive as to warrant remittitur.[2]

In this case, the jury awarded Plaintiff $10 million in past pain, disability, disfigurement, embarrassment, and emotional distress (hereinafter, "non-economic damages"), and $100 million in future non-economic damages. While "the jury should not pick a figure out of air, exact compensation for pain and suffering is impossible." *Eckerberg v. Inter-State Studio & Publishing Co.*, 860 F.3d 1079, 1088 (8th Cir. 2017) (quoting *Taken Alive v. Litzau*, 551 F.2d 196, 198 (8th Cir. 1977)). Thus, "[a]wards for pain and suffering are often 'highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms.'" *Id*. (citing *Hudson*, 709 F.3d at 705 (quoting *Frazier v. Iowa Beef Processors, Inc.*, 200 F.3d 1190, 1193 (8th Cir. 2000))); *accord Townsend v.*

---

[2] The Court notes that "there is some tension between a finding that the verdict was so excessive as to require remittitur and a finding that the verdict was not so excessive as to require a new trial on liability." *See Miller*, 402 F. Supp.3d at 581 n.4. As the Eighth Circuit has made clear, however, a court can find the size of a verdict not so excessive as to require a new trial, but excessive enough to warrant remittitur. *See id*. (citing *Wright*, 877 F.3d at 374-75).

*Bayer Corp.*, 774 F.3d 446, 466 (8th Cir. 2014).  That being said, having presided over the trial and reviewed the trial transcripts, the parties' filings, and the applicable law, the Court agrees with Defendant that the jury's $110 million non-economic damages award is shockingly excessive such that remittitur is required.

The evidence introduced at trial does not justify such an astronomical award.  While Plaintiff has undergone a dozen painful surgeries to repair his leg, has significant scarring, a noticeable gait-altering limp, and experiences pain and mobility and balance issues, he is able to walk and take care of his daily needs.  He cannot run, play sports, hike with his friends (especially in the mountains of his original homeland of Nepal), or hunt in the woods.  But, as Defendant points out, Plaintiff is not confined to a wheelchair, does not require round-the-clock supervision, and has retained his basic cognitive functions. Further, this incident happened when Plaintiff was just a first-year student at St. Cloud State University.  Though there was testimony that Plaintiff dropped out of the engineering program because he could not concentrate on his studies due to his pain, he was still able to graduate with a college degree.  The Court does not intend to minimize Plaintiff's injuries or experience.   To be clear, the Court is sympathetic to the pain Plaintiff experiences on a daily basis as well as the "shame and embarrassment associated with the loss of his academic and vocational dreams – including letting down his whole family and entire village" in Nepal.  *See* Plaintiff's Mem. in Opp. at 17, ECF No. 199.  The testimony and evidence presented at trial, however, does not support an unprecedented award of $110 million in non-economic damages.

Moreover, the non-economic damages award in this case is "the largest pain and

suffering award in a medical malpractice or personal injury case in Minnesota history by a wide margin," and is, indeed, the largest damages award in Minnesota history.  *See* Def.'s Mem. in Supp. at 1-2, 20-22.  As far as the Court and parties can discover, the Eighth Circuit has never upheld an award even remotely close to the award in this case.  In fact, the two cases Plaintiff urges the Court to use to "set the floor" in its remittitur analysis involve awards nowhere near even the same universe as the award in this case.  *See* Pl.'s Mem. in Supp. at 58 (citing *Tholen v. Assist America, Inc.*, No. 17-cv-3919 (DWF/TNL), ECF No. 481 (jury verdict awarding Plaintiff nearly $15 million in non-economic damages); *Bayes v. Biomet, Inc.*, No. 4:13-cv-00800-SRC, 2021 WL 3286594, at *9 (E.D. Mo. Aug. 2, 2021) (jury verdict awarding Plaintiff $21 million in non-economic damages), *aff'd*, *Bayes v. Biomet, Inc.*, 55 F.4th 643, 650-51 (8th Cir. 2022)).

In other words, the $110 million non-economic damages award here is more than five times greater than the largest damages award Plaintiff cites from cases in this Circuit. Such an award—so far above an award based in economic reality—is grossly excessive and cannot stand as a matter of law.  *See Dossett v. First State Bank*, 399 F.3d 940, 946 (8th Cir. 2005) (noting that plaintiff has "not identified any comparable award, and [this Circuit's] precedents generally involve damages well below the [nine]-figure sum at issue here").  An award for non-economic damages must be rendered in monetary terms. The astronomical amount of the non-economic award in this case is so far removed from economic realities that permitting it to stand would shake the foundations of confidence in the judicial system. Excluding the accident of birth and games of chance with extraordinary probabilities, how many lifetimes would it take to earn, passively or actively, enough for a

one-time lump sum of over $100 million dollars?  Laws ideally provide predictability. In the context of this case, such a non-economic award can neither be reasonably anticipated nor insured for.  Together with the reasons already given above, the Court concludes that remittitur is required.

In determining the amount of remittitur, the Court should not "substitute its judgment for the jury's and choose an amount that it would have found suitable had it been the factfinder." *Miller*, 402 F.Supp.3d at 584.  Rather, the Court must remit the award to the maximum possible amount that the jury could reasonably have awarded.  *Id*. (citing *Wright*, 877 F.3d at 374) ("If a remittitur was justified, the issue becomes whether it comports with the 'maximum recovery rule,' under which damages may be remitted only to the maximum amount the jury could have reasonably awarded."); *see also McCabe*, 608 F.3d at 1081 ("Under the maximum recovery rule, when a district court remits a jury award, the remitted amount cannot be 'for an amount less than the jury could reasonably find.'" (quoting *Slatton*, 506 F.2d at 509)).

The Eighth Circuit has stated that "[c]omparisons to other jury verdicts are often not particularly helpful in claims involving noneconomic damages." *Gonzalez v. United States*, 681 F.3d 949, 953 (8th Cir. 2012); *see also Miller*, 402 F.Supp.3d at 584.  It has further cautioned that the district court may even abuse its discretion by relying on such comparisons where the facts of the instant case "are not easily comparable to the facts of the other cases." *Gonzalez*, 681 F.3d at 953 (quoting *McCabe v. Parker*, 608 F.3d 1068, 1080 (8th Cir. 2010)).  The parties here, however, have not identified any other method for the Court to make a remitter decision, and, as another court in this District has correctly

23

pointed out, "[t]he Eighth Circuit also has not identified any other method (other than to recite the facts of the case under review and state that those facts are not comparable to the facts of other cases)." *Miller*, 402 F.Supp.3d at 584 (citing *Gonzalez*, 681 F.3d at 952-53). Thus, the Court will look to damage awards in other comparable cases for informative purposes only, with the understanding that such case comparisons are in no way determinative of the remittitur decision in this case. *See id*. at 585.

The parties disagree about which cases the Court should consider comparable. Defendant argues that "the only truly comparable cases are Minnesota cases involving compartment syndrome." *See* Def.'s Mem. in Supp. at 32; ECF No. 218 at 1 ("This Court should compare compartment syndrome verdicts in Minnesota."). Plaintiff, on the other hand, contends that the Court should look to "cases involving serious permanent orthopedic pain and functional loss similar to what the jury heard about" in this case. ECF No. 217 at 2. Plaintiff further contends that the Court should consider cases "from across jurisdictions," not just Minnesota. *See* Pl.'s Mem. in Opp. at 24 (citing an Eighth Circuit case that compared cases from Arizona, Missouri, Michigan, North Carolina, and Texas).

The Court finds that cases with the following characteristics are comparable to Plaintiff's case: (1) medical malpractice cases involving compartment syndrome, (2) where the plaintiff developed serious permanent orthopedic injuries, and (3) where the damages included non-economic damages like pain, disability, disfigurement, embarrassment, and emotional distress. The Court reaches this conclusion because these characteristics are "easily comparable to the facts of" Plaintiff's case. *See Gonzalez*, 681 F.3d at 953 (citing *McCabe*, 608 F.3d at 1080). This approach is also consistent with how the Eighth Circuit

24

addresses comparable cases.  *See, e.g.*, *McCabe*, 608 F.3d at 1082 (comparing Fourth Amendment cases that (1) involved female plaintiffs, (2) who were arrested for minor or invalid infractions, (3) who were subjected to both strip and body cavity searches, and (4) where the damages were solely for the emotional distress generally associated with an unlawful strip and body cavity search); *Bayes v. Biomet, Inc.*, 55 F.4th 643, 651 (8th Cir. 2022) (comparing products liability cases involving "metal-on-metal hip implant failures").  Further, the Court will look beyond Minnesota and the Eighth Circuit, which is consistent with how the Eighth Circuit compares cases.  *See, e.g.*, *McCabe*, 608 F.3d at 1082 (finding that a Seventh Circuit case was "properly considered as comparable" because it shared similar facts to the plaintiff's case); *Bayes*, 55 F.4th at 651 (comparing cases from other jurisdictions); *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1301 (8th Cir. 1987) (same).

The Court first considers comparable cases from the State and District of Minnesota. Such comparable cases provide especially helpful guidance to the Court in its analysis in this case because juries in Minnesota cases are comprised of people from the community of Minnesota and, further, because Minnesota juries apply Minnesota state law in medical malpractice cases.  Verdicts in comparable Minnesota cases show a minimal range of quite modest non-economic damages awards, from about $682,000 to $1,260,000 in today's dollars.  *See, e.g.*, *Michog v. Mayo Clinic Rochester*, 2006 WL 4911726 (Minn. Dist. Ct., Olmstead Cty., 2006) (awarding $450,000 (approximately $682,000 in today's dollars[3])

---

[3] "[W]hen adopting a damage comparison approach, the court must adjust the comparable awards for inflation . . . ." *Miller*, 402 F.Supp.3d at 583 n.5 (quoting *McCabe*, 608 F.3d at 1082).  To determine the award adjusted for inflation, the Court uses the Bureau of Labor Statistics' Consumer Price Index inflation calculation, which can be found at https://www.bls.gov/data/inflation_calculator.htm.

for pain, disability, disfigurement, embarrassment, and emotional distress damages to plaintiff who developed compartment syndrome resulting in amputation of plaintiff's right arm and forearm); *Arrigoni v. Healtheast Woodwings Hosp.*, 2016 WL 9024688, 2017 WL 2439095 (Minn. Dist. Ct., Ramsey Cty., 2017) (awarding $753,000 (approximately $941,000 in today's dollars) for pain and suffering damages—an amount less than that awarded for past and future medical-related expenses—to plaintiff who developed compartment syndrome "resulting in a permanent left foot drop nerve injury and the need for numerous follow-up surgical procedures" and "ongoing care and treatment due to pain and altered sensation in the left foot"); *Middaugh v. Gillette Children's Hosp.*, 1990 WL 466128 (D. Minn. 1990) (awarding $550,000 (approximately $1.26 million in today's dollars) for pain, disability, disfigurement, and emotional distress damages to plaintiff who developed compartment syndrome which led to the destruction of much of the muscle tissue in plaintiff's leg);

Non-economic damages awards from comparable cases in other jurisdictions also inform the Court's analysis. Verdicts in such cases vary substantially more than those in Minnesota. *See, e.g.*, *Burke v. Carrion*, 101 A.D.3d 920 (N.Y. App. Div. 2d Dept. 2012) (awarding $1.5 million (approximately $2.1 million in today's dollars) for pain and suffering damages to plaintiff who developed compartment syndrome resulting in loss of muscle strength and coordination throughout his entire body); *Alsop v. Reichard, D.O.; Friedman, M.D.*, 2018 WL 3105201 (N.J. Super. L. 2018) (awarding $1.75 million (approximately $2.15 million in today's dollars) to 16-year-old plaintiff who developed compartment syndrome which resulted in foot drop and muscle and nerve damage);

26

*Blatchley v. St. Anthony Summit Medical Center*, 2019 WL 7593157 (D. Colo. Feb. 27, 2019), 822 Fed.Appx. 663 (10th Cir. 2020) (awarding $2 million (approximately $2.4 million in today's dollars) in non-economic damages to plaintiff who developed compartment syndrome resulting in permanent disability and ongoing pain); *Trevino v. Sheinkop, M.D., Lee, M.D.*, 2015 WL 1518601 (Ill. Cir. Ct. 2015) (awarding $2.5 million (approximately $3.3 million in today's dollars) in pain and suffering damages to plaintiff who developed compartment syndrome resulting in right leg deformity and tissue necrosis in her right knee and leg); *Lathan v. Bridgeport Hosp.*, 2013 WL 5978935 (Conn. Super. 2013) (awarding $8 million (approximately $10.5 million in today's dollars) in non-economic damages to plaintiff who developed compartment syndrome, albeit along with other complications, such as an inoperable incisional hernia and a right clavicle abscess caused by infection that resulted in chronic osteomyelitis of her right clavicle); *D.S., Pro Ami, Sousa v. Prosser, D.O.; Prime Healthcare Services-Garden City Hosp. LLC., d/b/a Garden City Hosp.*, 2019 WL 7820861, 2019 WL 7904811 (La. Civil D. Ct. 2019) (awarding $10 million (approximately $11.9 million in today's dollars) in impairment, disfigurement, pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life damages to plaintiff who developed compartment syndrome which led to permanent loss of use of plaintiff's dominant right hand and arm).

Plaintiff argues that the Court should consider *Bayes* and *Tholen* as comparable cases. *See* Pl.'s Mem. in Opp. at 58 ("[I]f the Court is inclined to compare cases and remit, *Tholen* and *Bayes* must set the floor."). But Plaintiff's reliance on *Bayes* is misplaced. *Bayes* involved a 71-year-old plaintiff who sued the manufacturer of a metal-on-metal hip

27

implant for strict liability product-defect and negligent design.  *See Bayes*, 55 F.4th at 645-46.  *Bayes* is a products liability case—not a medical malpractice case—and does not involve compartment syndrome.  *See id*.  Further, when the Eighth Circuit conducted a case comparison in *Bayes*, it compared verdicts only "in metal-on-metal hip implant cases," not other cases with different types of implants, other orthopedic-related injuries, or non-products-liability cases.  *See Bayes*, 55 F.4th at 650-51.  The facts of *Bayes* "are not easily comparable to the facts of" Plaintiff's case, and the Court therefore cannot rely on comparisons to the *Bayes* verdict.  *See Gonzalez*, 681 F.3d at 953 (citing *McCabe*, 608 F.3d at 1080).

Nor are the facts of *Tholen* easily comparable to this case.  While the plaintiff in *Tholen* developed probable compartment syndrome after sustaining a severe knee injury and receiving "substandard treatment" at a clinic and hospital in Mazatlán, Mexico, the case involved claims for negligence and breach of contract arising in connection with a contract for medical insurance for overseas travelers.  *Tholen v. Assist America Inc.*, No. 17-cv-3919 (DWF/TNL), ECF No. 96.  The *Tholen* case did not involve claims against the clinic, the hospital, or any of its doctors for failure to treat compartment syndrome properly.  Rather, the plaintiff sued a company that provides "emergency medical evaluation" services for failing to "use whatever mode of transport, equipment and personnel necessary to evacuate [him] to the nearest [medical] facility capable of providing a high standard of care."  *Id*., ECF No. 96 ¶¶ 1-3.  Further, the damages award in the *Tholen* case was not broken down into economic damages and non-economic damages.  The jury in *Tholen* awarded the plaintiff $4,246,660.49 to compensate him for "all past harm he has suffered,"

28

and $10,636,255 for "all future harm he is reasonably expected to suffer." *Id*., ECF No. 481 at 1-2. But in considering damages, the jury in *Tholen* was instructed to consider not only past and future pain, disability, disfigurement, embarrassment, emotional distress, and loss of enjoyment of life, but also healthcare expenses, such as medical supplies, hospitalization, and "health care services of every kind necessary for treatment," as well as lost earnings, including earnings, salary, and value of working time lost as a result of the injury. *See id*., ECF No. 483 at 11-15. As such, it is impossible to know what the jury awarded the plaintiff in economic damages versus non-economic damages. Moreover, *Tholen* involved several facts that make it reasonable to infer those economic damages were higher in *Tholen* than in the instant case. For example, the plaintiff in *Tholen* had his right leg amputated as a result of his injuries. *See id*., ECF No. 96 ¶ 6. It was undisputed at trial that the plaintiff would have future prosthetic costs of about $1.3 million. *See id.*, ECF No. 479 at 1849. In addition, the plaintiff in *Tholen* was "a board-certified nationally recognized plastic surgeon." *See id*., ECF No. 96 ¶ 14. In *Tholen*, the plaintiff's attorney argued in his closing statement that the jury should award about $750,000 in past lost income and $2.7 million in future economic harm. *See id*., ECF No. 479 at 1850. Thus, while the jury in *Tholen* awarded the plaintiff $14,882,915.49 in past and future harm, it is likely that a substantial portion of this award was for economic damages. Accordingly, the Court finds that the unique facts of *Tholen* "are not easily comparable to the facts of" Plaintiff's case, and the Court therefore cannot rely on comparisons to the *Tholen* verdict. *See Gonzalez*, 681 F.3d at 953 (citing *McCabe*, 608 F.3d at 1080).

Having presided over the trial and reviewed the applicable law and comparable

cases (for informative purposes only), the Court concludes that **$10 million** is the maximum amount of non-economic damages that the jury could have reasonably awarded in this case. This amount—though a significant reduction from the $110 million in non-economic damages the jury awarded—is larger than most non-economic damages awards in cases the Court has identified as comparable and considers the evidence presented at trial in the light most favorable to the jury award. *See Wright*, 877 F.3d at 373; *see also McCabe*, 608 F.3d at 1081 (noting that the Court "is not at liberty to remit an award to the low end of the range, or even somewhere in the middle of the range," and must instead "remit the award to the *maximum* amount identified as within the reasonable range." (emphasis in original)).

In sum, the Court finds that $110 million in non-economic damages is shockingly excessive in this case. The Court further finds that $10 million is the highest amount that the jury could reasonably have awarded for non-economic damages. **The Court will therefore offer Plaintiff the choice to accept a remittitur to $10 million in non-economic damages or to again try the issue of non-economic damages**. *See Ross*, 293 F.3d at 1049 ("[T]he traditional remedy of remittitur does require the plaintiff's consent in order to comport with the Seventh Amendment right to jury trial."); *Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1212 (8th Cir. 1999) (finding that the district court erred by ordering remittitur without plaintiff's consent and should have instead ordered remittitur by conditioning denial of new trial on plaintiff's consent to remittitur); *Wright*, 877 F.3d at 378 (same); *see also Miller*, 402 F.Supp.3d at 588 (finding remittitur appropriate and offering plaintiff "the choice to accept remittitur . . . or to again try the issue of [] non-

economic damages"); *Townsend*, 774 F.3d at 467 (same). **No later than 12:00 p.m. (noon, CST) on November 28, 2023, Plaintiff must file a letter stating whether he will agree to remit the jury's award of non-economic damages from $110 million to $10 million**. If Plaintiff chooses to remit, the Court will enter judgment. If Plaintiff chooses not to remit, the Court will schedule a new trial on the issue of non-economic damages. The jury's economic damages award of $1,251,559.22 stands and is not affected by the Court's decision. Thus, if Plaintiff agrees to remit as indicated above, $10 million in non-economic damages plus **$1,251,559.22** in economic damages equals a total award of **$11,251,559.22**.

### III. ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Defendant's Motion for New Trial, or Alternatively, Remittitur, ECF No. 183, is **GRANTED IN PART and DENIED IN PART.**

    a.   The motion is **GRANTED** to the extent that the Court conditionally grants a new trial on the issue of non-economic damages.

    b.   No later than **12:00 p.m. (noon, CST)** on **November 28, 2023**, Plaintiff must file a letter stating whether he will agree to remit the jury's award of non-economic damages from $110 million to **$10 million**. If Plaintiff chooses to remit, the Court will enter judgment. If Plaintiff chooses not to remit, the Court will schedule a new trial on the issue of non-economic damages. The jury's economic damages award of **$1,251,559.22** stands and is not affected by the Court's decision. Thus, if Plaintiff agrees to remit as indicated above, $10 million in non-economic damages plus $1,251,559.22 in economic damages equals a total award of **$11,251,559.22.**

    c.   The motion is **DENIED** in all other respects.

2.   The parties shall meet and confer in a good-faith effort to resolve the issues raised by Plaintiff's Fed. R. Civ. P. 59(e) Motion to Amend Judgment to

Include Interest, ECF No. 187. If Plaintiff chooses to remit and the parties can agree to the amount of pre-judgment and post-judgment interest, the parties shall submit a stipulation and proposed order to the Court no later than **December 12, 2023**. If Plaintiff chooses to remit but the parties cannot agree to the amount of pre-judgment and post-judgment interest, the parties shall each submit a memorandum of law outlining their respective positions, any affidavits and exhibits, and a proposed order no later than **December 12, 2023**.

3.    The parties shall meet and confer in a good-faith effort to resolve the issues raised by Defendant's Motion for Determination of Collateral Sources, ECF No. 161. If the parties can agree to the amount of collateral source reductions or offsets pursuant to Minn. Stat. § 548.251, the parties shall submit a stipulation and proposed order to the Court no later than **December 12, 2023**. If the parties cannot agree, the parties shall each submit a memorandum of law outlining their respective positions, any affidavits, exhibits, or other evidence of (1) amounts of collateral sources that have been paid for the benefit of Plaintiff or are otherwise available to Plaintiff as a result of losses except those for which a subrogation right has been asserted, and (2) amounts that have been paid, contributed, or forfeited by, or on behalf of, Plaintiff or members of his immediate family for the two-year period immediately before the accrual of the action to secure the right to a collateral source benefit that Plaintiff is receiving as a result of losses, and a proposed order no later than **December 12, 2023**.

Dated: October 26, 2023

*s/ Tony N. Leung*
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*Thapa v. St. Cloud Orthopedic Associates, Ltd.*
Case No. 19-cv-2568 (TNL)